UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GARY FEDOROFF,

          Plaintiff,

     v.

ROCKET MORTGAGE, LLC,

          Defendant.

Case No.  26-cv-00702-JSC

**ORDER GRANTING DEFENDANT'S MOTION TO TRANSFER**

Re: Dkt. No. 22

Plaintiff Gary Federoff, on behalf of himself and a putative class, alleges Defendant Rocket Mortgage, LLC unlawfully disclosed sensitive information related to his mortgage refinancing application.  (Dkt. No. 1.)[1]  Before the Court is Defendant's motion to transfer this case to the Eastern District of Michigan.  (Dkt. No. 22.)  For the reasons set forth below, the Court GRANTS Defendant's motion and transfers the case to the Eastern District of Michigan pursuant to 28 U.S.C. § 1404(a).  Plaintiff had inquiry notice of and assented to the Terms of Use, hyperlinked on his refinancing application, which contained a binding, enforceable forum selection clause.  Accordingly, the Court disregards Plaintiff's choice of forum and considers only the public-interest factors under 28 U.S.C. § 1404(a), and Plaintiff has not shown those factors overwhelmingly disfavor transfer.

**BACKGROUND**

**I.        Complaint Allegations**

Defendant is an LLC "organized and existing under the laws of Michigan," with its

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents

principal place of business in Detroit.  (Dkt. No. 1. ¶ 11.)  Defendant "is one of the largest online mortgage lenders that operates a website www.rocketmortgage.com[.]"  (*Id.* ¶ 1.)  Defendant advertises it is "a way to get a mortgage. Just tell us about yourself, your home and your finances, and we'll give you real interest rates and numbers – not just our best guess."  (*Id.* ¶ 27.)  "Then, [Defendant] will guide you through the mortgage process, from getting approved to closing to managing your payments."  (*Id.*)

"Consumers can apply for a […] mortgage refinance directly on the […] Website," and they do so "by answering a series of questions on the Website."  (*Id.* ¶¶ 1, 52.)  A quote presumably taken from Defendant's website states:

> Rocket Mortgage® was designed to walk you through the entire mortgage process from application to closing. Our online application asks you a series of questions to evaluate your eligibility for a home loan. Then, we use the information you gave us, and information from your credit report, to provide you with mortgage recommendations and see if we can approve you.

(*Id.* ¶ 52; *see id.* ¶ 51 (alleging, in the immediately preceding paragraph, a screenshot "depicting the landing page for rocketmortgage.com leading to the form to be filled out").)

In November 2025 Plaintiff "visited" Defendant's website, "navigated to the refinancing section of" the website, then "completed [Defendant's] online refinancing application, which required him to provide detailed personal information including his full legal name, email address, phone number, and residential address."  (*Id.* ¶¶ 62, 64.)  "The refinancing application also required Plaintiff to disclose sensitive financial information that is not available in public records, including his estimated current home value, requested refinance loan amount, current monthly mortgage payment, monthly homeowners insurance premium, monthly property tax payment, and the specific purpose of Plaintiff's refinance application."  (*Id.* ¶ 65.)

Then, Defendant disclosed information related to Plaintiff's mortgage refinancing application through tracking technologies embedded on Defendant's website.  (*Id.* ¶¶ 30-50.)  One of those technologies, Optimizely, "allows Defendant to track and share" details about a customer's visit to the website, including the "actions" taken and "when" the visit took place.  (*Id.* ¶ 47.)  Plaintiff brings various privacy claims under California law based on these disclosures.  (*Id.*

United States District Court
Northern District of California

¶¶ 95-191.)

## II.    Defendant's Evidence

One of Defendant's employees, Ms. Courtney, submitted a declaration about Plaintiff's mortgage refinancing application, which initially takes the form of a chat conversation.  She attests her past and present job responsibilities working for Defendant included "reviewing, analyzing, collecting, and identifying website records, client data, website pages, and other data and information maintained in the ordinary course of business in Rocket Mortgage's systems of record."  (Dkt. No. 22-11 ¶ 3.)  She further attests "[a]ccording to Rocket Mortgage's business records that are maintained in the ordinary course of business, Plaintiff Fedoroff submitted his refinancing application via chat on November 2, 2025."  (*Id.* ¶ 9.)

Ms. Courtney attaches to her declaration a screenshot of "the submission page for Plaintiff's refinancing application."  (*Id.* ¶ 10.)  As relevant here, the screenshot illustrates:

United States District Court
Northern District of California

3

(Dkt. No. 22-12 at 2.)  The webpage has a white background.  (*See id.*)  At the top is a blurb saying, among other things, "[c]onfirm your contact info and discover what's possible" in black text, with a contrasting light-gray background.  (*Id.*)  Below the blurb are four fields titled "First name" "Last name" "Phone number" and "Email address (optional)."  (*Id.*)  Those fields, just like the blurb, have black text and a contrasting light-gray background.

Underneath those four fields is a paragraph with text that is virtually the same size as the fields' text, but the paragraph's text has a slightly lighter gray hue and contrasts with a white background.  (*See id.*)  The paragraph occupies nearly as much space as the four fields combined. (*See id.*)  The first two sentences say "For text messages, data rates may apply and message frequency varies. Reply STOP to unsubscribe or HELP for help."  (*Id.*)  The third sentence states "By providing your contact info and clicking 'Confirm & continue' below, you agree to our

**Privacy Policy** and **Terms of Use**[.]" (*Id.* (bold and underline in original)).  The words "Privacy Policy" and "Terms of Use" are underlined, bolded, capitalized as though they were proper nouns, and hyperlinked to separate webpages containing the Privacy Policy and Terms of Use.  (*See id.*)  The paragraph concludes with two more sentences regarding telemarketing, which occupy roughly 60% of the paragraph's space.  (*See id.*)  Finally, the bottom of the screenshot has a black button saying "Confirm & continue."  (*Id.*)

Ms. Courtney attests clicking the hyperlink on the words "Terms of Use" takes users to a separate webpage titled "Rocket Terms of Use."  (Dkt. No. 22-11 ¶ 12; Dkt. No. 22-13 at 2-8.)  As relevant here, the Terms contain an arbitration provision for claims related to the Telephone Consumer Protection Act, then state "[a]ll other claims arising under these Terms or from use of the Website shall be resolved exclusively in the state or federal courts located in Detroit, Michigan, and you consent to the jurisdiction of these courts for such purposes."  (Dkt. No. 22-13 at 5.)  Next, a "Governing law" section states "[t]hese Terms and any disputes arising from your use of the Website shall be governed by the State of Michigan, without regard to its conflict of law principles."  (*Id.*)

Ms. Courtney also attests "to submit a refinancing application, Plaintiff was required to agree to Rocket Mortgage's Terms of Use [] by clicking a 'Confirm & continue' button."  (Dkt. No. 22-11 ¶¶ 9-10.)  And Plaintiff purportedly did so: "during Plaintiff's November 2, 2025 chat conversation, Plaintiff entered his contact information (including first name, last name, email, and phone number) and agreed to the Terms by clicking "Confirm & continue," and then proceeded to engage in the chat conversation."  (*Id.* ¶ 15.)  Plaintiff then followed up with Defendant over the next month:

> [A]ccording to Rocket Mortgage's business records, Plaintiff accessed an account previously created with Rocket Mortgage and submitted documents in support of his refinancing application between November 6, 2025 and November 14, 2025, and interacted with Rocket Mortgage's mortgage bankers by telephone and text between November 6, 2025 and December 6, 2025. Plaintiff's refinancing application was denied on December 7, 2025.

(*Id.* ¶ 16.)

## DISCUSSION

Defendant moves to transfer under 28 U.S.C. 1404(a).  Under 28 U.S.C. § 1404(a), a

United States District Court
Northern District of California

district court may "transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented ... [f]or the convenience of parties and witnesses." 28 U.S.C. § 1404(a). In considering such a transfer, courts weigh various factors "and decide whether, on balance, a transfer would serve 'the convenience of parties and witnesses' and otherwise promote 'the interest of justice.'" *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 62–63 (2013) (quoting 28 U.S.C. § 1404(a)). "The calculus changes, however, when the parties' contract contains a valid forum-selection clause, which represents the parties' agreement as to the most proper forum." *Id.* at 63 (cleaned up). Under such circumstances, "a proper application of § 1404(a) requires that a forum-selection clause be given controlling weight in all but the most exceptional cases." *Id.* at 59–60 (cleaned up). By "[e]nforc[ing] ... valid forum-selection clauses, bargained for by the parties, [the court] protects their legitimate expectations and furthers vital interests of the justice system." *Id.* at 63 (cleaned up). Accordingly, when presented with such an agreement, the court must disregard the plaintiff's choice of forum and the parties' private interests. *Id.* at 63–64. The court instead weighs the "public-interest factors only," and "those factors will rarely defeat a transfer motion." *Id.* at 64. Further, "the party acting in violation of the forum-selection clause [...] must bear the burden of showing that public-interest factors overwhelmingly disfavor a transfer." *Id.* at 67.

Here, the parties agree Plaintiff filled out a mortgage refinancing application on Defendant's website in November 2025 which "required him to provide," at a minimum, "his full legal name, email address, [and] phone number." (*See* Dkt. No. 1 ¶¶ 62, 64; Dkt. No. 22-11 ¶ 15; Dkt. No. 22-12 at 2.) Defendant asserts by entering this contact information, then clicking "Confirm & continue," Plaintiff agreed to the website's Terms of Use, which bind Plaintiff to the forum selection clause requiring him to litigate the case in a court in Detroit, Michigan. (Dkt. No. 22-1 at 14-15; Dkt. No. 22-12 at 2.)

As the party seeking to enforce the forum selection clause, Defendant "bears the burden of proving the existence of an agreement ... by a preponderance of the evidence." *Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279, 1283 (9th Cir. 2017) (cleaned up). The parties agree California law applies to this question. (Dkt. No. 22-1 at 14 n.1 (noting the Terms of Use says

Michigan law applies, and California applies the same contract formation principles as Michigan); Dkt. No. 23 at 4 n.1 (asserting California law applies).)  Given the parties' agreement, the Court assumes California law applies.  "To form a contract under ... California law, the parties must manifest their mutual assent to the terms of the agreement." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022).  "[I]f a website offers contractual terms to those who use the site, and a user engages in conduct that manifests her acceptance of those terms, an enforceable agreement can be formed." *Id.* at 855–56.

### A.  Defendant's Evidence as to What Plaintiff Encountered is Undisputed

As an initial matter, Plaintiff asserts Defendant's screenshot is not "competent … evidence" of a purported agreement for three reasons.  (Dkt. No. 23 at 5.)  First, the screenshot does not show everything Plaintiff encountered on the website because it does not show the previous or subsequent pages Plaintiff viewed, the "device Plaintiff used," "whether the notice was visible without scrolling," and whether the screenshot "portrays the page Plaintiff saw during his visit in November 2025." (*Id.*)  Second, Plaintiff asserts the screenshot attached to Ms. Courtney's declaration "clearly is not" a "'true and correct screenshot of the submission page for Plaintiff's refinancing application.'" (Dkt. No. 23 at 6 (quoting Dkt. No. 22-11 ¶ 10).)  Plaintiff asserts the screenshot is "clearly" not what the website looked like during Plaintiff's visit because it is "common sense" "the 'Confirm & *continue*" button indicates there are additional steps in the process" and Defendant's evidence shows "Plaintiff submitted documents in support of the application" in the two weeks after his website visit, yet "ostensibly the application could not be formally submitted for consideration without this documentation." (Dkt. No. 23 at 6.)  Plaintiff does not explain or offer evidence why the application "ostensibly" required this documentation on the day Plaintiff visited the website.  Third, Plaintiff reiterates his allegation "Defendant installed tracking technology from Optimizely on its website." (*Id.* at 6-7.)  Plaintiff then cites portions of Optimizely's website which his complaint does not allege to suggest "Optimizely *may* cause multiple variants of the same page to be presented to users" because "[t]hrough Optimizely, website operators *can* modify and reorder the sequence of on-page elements, *allowing* them to change what users actually see while visiting their website." (*Id.* (emphasis added).)

Plaintiff's argument Defendant has not offered competent evidence of the website Plaintiff

United States District Court
Northern District of California

visited is unavailing.  Plaintiff expressly alleges in November 2025 he "visited" the website, "navigated to the refinancing application section" of Defendant's website to complete a refinancing application," then "completed Rocket Mortgage's online refinancing application, which required him to provide […] his full legal name, email address, phone number, and residential address." (Dkt. No. 1 ¶¶ 62-64.)  And Ms. Courtney attests the screenshot attached to her declaration is "a true and correct screenshot of the submission page for Plaintiff's refinancing application." (Dkt. Nos. 22-11 ¶ 10, 22-12 at 2.)  Yet, Plaintiff does not offer any evidence contradicting Ms. Courtney's testimony or her screenshot of what Plaintiff encountered.  Instead, Plaintiff gestures to vague, unsupported notions of "common sense" and what is "ostensibly" true about the application process Plaintiff experienced.  (Dkt. No. 23 at 5-7.)  Plaintiff then quotes another company's website as evidence of features Defendant is technically "allow[ed]" to use in designing its website, but does not offer any declaration or other evidence Defendant made any design choices that would make Defendant's screenshot differ from Defendant's evidence as to what Plaintiff saw in November 2025.  (*Id.*)  So, given Plaintiff does not offer evidence that rebuts Defendant's evidence, Defendant has provided competent evidence of the website Plaintiff encountered in November 2025.  Accordingly, the next question is whether the website's Terms of Use, shown in Defendant's screenshot, contained a valid and enforceable forum selection clause.

### B.  The Terms Included a Valid Forum Selection Clause

In California, "internet contracts are classified 'by the way in which the user purportedly gives their assent to be bound by the associated terms: browsewraps, clickwraps, scrollwraps, and sign-in wraps.'" *Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1014 (9th Cir. 2024) (quoting *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 463 (2021)).  Here, the parties dispute whether the Terms of Use should be analyzed as a "browsewrap" or a "sign-in wrap" agreement. A "browsewrap" is an agreement where "an internet user accepts a website's terms of use merely by browsing the site." *Sellers*, 73 Cal. App. 5th at 463.  By contrast, under a "sign-in wrap" agreement, "a user signs up to use an internet product or service, and the sign-up screen states that acceptance of a separate agreement is required before the user can access a service." *Id.* at 464. For the latter sort of agreements, "[w]hile a link to the separate agreement is provided, users are

not required to indicate that they have read the agreement's terms before signing up." *Id.*

Here, the refinancing application contains a sign-in wrap agreement. It is undisputed in November 2025, Plaintiff provided his information to obtain an online application, *i.e.*, he "sign[ed] up to use an internet product or service." (Dkt. No. 1 ¶¶ 62, 64; Dkt. No. 22-11 ¶ 15); *Sellers*, 73 Cal. App. 5th at 464. At the time, Defendant's website stated "[b]y providing your contact info and clicking 'Confirm & continue' below, you agree to our **Privacy Policy** and **Terms of Use**," and linked users to the Terms of Use on a separate webpage. (Dkt. No. 22-11 ¶ 12; Dkt. No. 22-12 at 2.) In other words, "the sign-up screen state[d] that acceptance of a separate agreement is required" and "a link to the separate agreement [was] provided," which is a classic sign-in wrap agreement. *Sellers*, 73 Cal. App. 5th at 464. Plaintiff emphasizes how on a separate website page, the Terms state "you accept and agree to these Terms" "[b]y accessing or using the website," which is a feature of browsewrap agreements. (Dkt. No. 22-12 at 3); *Sellers*, 73 Cal. App. 5th at 463. But an internet contract is defined "by the way in which the user purportedly gives their assent to be bound." *Sellers*, 73 Cal. App. 5th at 463. And here, Defendant asserts Plaintiff assented to the Terms by clicking a button on a sign-up page, not by merely accessing or using the website. That the Terms may have also included a browsewrap agreement does not nullify the refinancing application's sign-in wrap agreement; at least Plaintiff does not offer any caselaw or even reason why that would be so.

Thus, the hyperlinked Terms are a sign-in wrap agreement, meaning Plaintiff is "not required to indicate that [he had] read the agreement's terms before signing up." *Id.* at 464. Rather, to be enforceable, the website operator must show the user had "actual knowledge" or "inquiry notice" of the agreement. *Berman*, 30 F.4th at 856. Here, Defendant asserts Plaintiff had inquiry notice of the agreement, which requires "(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Id.* The central dispute here is whether Defendant's website provided reasonably conspicuous notice of the hyperlinked Terms of Use.

//

9

**1. Defendant's Website Provided Reasonably Conspicuous Notice**

To determine whether a website provides reasonably conspicuous notice of its terms such that a "reasonably prudent Internet user would have seen it," courts consider "the placement of the notice" and "the context of the transaction." *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 515–16 (9th Cir. 2023) (cleaned up). As for notice placement, certain factors are relevant to the "visual analysis of webpages and hyperlinks, such as the location of the advisal on the webpage or the font size, color, and contrast." *Godun v. JustAnswer LLC*, 135 F.4th 699, 709 (9th Cir. 2025); *see also Berman*, 30 F.4th at 856–57 (considering notice to be insufficiently conspicuous when the notice was printed in a "barely legible" gray font that also failed to denote the existence of a hyperlink in a recognizable way, such as in blue font or all capitalized letters). And in transactions that entail a continuing relationship, as opposed to "one-time" interaction, courts assume a reasonably prudent user would be more likely to expect to be governed by some terms and thus be on notice of a link to those terms. *See Sellers*, 73 Cal. App. 5th at 476–77 (noting a user would expect an ongoing relationship with contractual terms when they download an app and register for an account, but not when the user merely begins a $5 trial or is engaging in a "one-time" purchase).

Plaintiff asserts Defendant's website did not provide reasonably conspicuous notice under either consideration. As for notice placement, Plaintiff makes two overarching arguments. First, "Defendant chose to do the bare minimum to set the Terms apart from the surrounding text" because the hyperlinked words "Terms of Use" are underlined, bolded, the same color and size as the surrounding text, and not in all capital letters. (Dkt. No. 23 at 8-9.) Second, the paragraph is "cluttered" in the sense the words "Terms of Use" are "stuck in the middle of a very long and busy paragraph." (*Id.* at 9.) The clutter "matters because the more distinct and unrelated issues that were bundled into one dense paragraph, the more likely it is that a reasonable user's attention will be drawn away from any single topic, including the Terms. A typical user[ …] would understandably gloss over the […] hyperlink[.]" (*Id.*) Regarding the transaction context, Plaintiff emphasizes Defendant's website "is a noncommittal start of a refinancing inquiry" and "does not evidence intent to formalize a long-term relationship" between Plaintiff and Defendant because the

United States District Court
Northern District of California

website "denotes the *beginning* of an inquiry into *potential* mortgage refinancing *options*." (*Id.* at 11 (first emphasis in original, second and third emphasis added).)

### a. Notice Placement

The placement and visual characteristics of "Terms of Use" provided reasonably conspicuous notice. The words "Terms of Use" are underlined, bolded, and capitalized as though they are proper nouns, all of which are features which contrast to the surrounding text. (*See* Dkt. No. 22-12 at 2.) "Terms of Use" also appears in the paragraph directly above the "Confirm & continue" button. So, because people read from top to bottom, "a reader would naturally see the notice before their eyes move to" the "Confirm & continue" button. *Beltran v. Nationstar Mortg. LLC*, 2026 WL 637337, at *5 (N.D. Cal. Mar. 6, 2026). Although the hyperlink is not blue, the contrasting features, coupled with a lack of distracting features elsewhere on the webpage, make "Terms of Use" stand out enough for a reasonable internet user to notice it and recognize it is a hyperlink to a separate webpage.

Plaintiff's reliance on *Sellers* and *Berman* is misplaced. For two webpages in *Sellers*, "the hyperlink [… was] underlined" and did not "otherwise draw the user's attention *in any way*," but here there are multiple visual elements "draw[ing] the user's attention" to the words "Terms of Use." *See Sellers*, 73 Cal. App. 5th at 481 (emphasis added). *Sellers* also emphasized

> the text [for the first webpage] appears below the white payment box, outside the user's primary area of focus, and not in visual proximity … to the request for consent. Similarly, the textual notice on the mobile version is at the very bottom of the screen, in smaller text than anything else on the page, and in a grey hue that contrasts less with the dark background than any other text on the page.

*Id.* at 479 (cleaned up). *Berman*'s textual notice suffered similar problems. *See* 30 F.4th at 856–57 ("It is printed in a tiny gray font considerably smaller than the font used in the surrounding website elements[. …] And the textual notice is further deemphasized by the overall design of the webpage[.]") Here, the "Terms of Use" hyperlink is much easier to see because it has none of those problems. It appears *above* the "Confirm & continue" button, meaning it is within "the user's primary area focus" and is "in visual proximity … to the request for consent." (*See* Dkt. No. 22-12 at 2); *Sellers*, 73 Cal. App. 5th at 479 (cleaned up). The "Terms of Use" text also has

11

United States District Court
Northern District of California

virtually the same font size as the preceding text fields, and its hue contrasts equally well with its background compared to the other text on the webpage.  (*See* Dkt. No. 22-12 at 2); *Sellers*, 73 Cal. App. 5th at 479.  In other words, the "Terms of Use" here are not "buried in fine print" and Defendant has "do[ne] more than simply underscore the hyperlinked text to ensure that it is sufficiently 'set apart' from the surrounding text."  *Berman*, 30 F.4th at 857 (quoting *Sellers*, 73 Cal. App. 5th at 481).

Plaintiff's other cited cases–*Dawson v. Target Corp.*, 2025 WL 1651940 (N.D. Cal. June 11, 2025) and *Cavanaugh v. Fanatics, LLC*, 738 F. Supp. 3d 1285 (E.D. Cal. 2024)–do not persuade.  Plaintiff emphasizes *Dawson*'s textual notice "lack[ed] a contrasting color and are in the same black text as the majority of the text on the screens" and *Cavanaugh* reasoned "hyperlinks must be offset in a more obvious way than [] underlining."  2025 WL 1651940, at *3; 738 F. Supp. 3d at 1296.  But there are no "per se design rules that must be followed for a contract to be formed between a website user and provider."  *Godun*, 135 F.4th at 710.  Indeed, *Sellers* explicitly declined to adopt "clear rules" or a "set of rules" for examining a notice's placement and visual elements.  73 Cal. App. 5th at 474.  Instead, *Sellers* acknowledged the criteria courts apply is "largely subjective, and there naturally may be different views regarding, for example, what size or color of text makes a given textual notice sufficiently conspicuous to bind a user."  *Id.* at 473. To the extent *Sellers* creates a minimum standard for when a sign-in wrap agreement creates reasonably conspicuous notice, Defendant's notice here exceeds that standard in many respects. *See id.* at 480–81 & n.1 (finding insufficient notice placement when there is a combination of: "extremely small" font "in relation to the other text on the screen," the text's placement "outside" areas on the webpage "where the consumer's attention would necessarily be focused," the text's color contrast with the page's "background," and a hyperlink that was underlined without "any other way that may draw the attention of the consumer"); *id.* at 481 ("[c]onsidering all of these factors together," finding insufficient notice placement due to the text's relative size, its "grey shade that contrasts with the dark background significantly less than the other text on the page," and the fact its hyperlink was merely underlined.)

Finally, Plaintiff's argument the words "Terms of Use" are "stuck in the middle of a very

long and busy paragraph" (Dkt. No. 23 at 9) is unavailing for two reasons. First, Plaintiff cites no authority holding a hyperlinked textual notice is not reasonably conspicuous because "distinct and unrelated issues" would draw "a reasonable user's attention […] away from […] the Terms." (*Id.*) *Sellers* contemplates whether a reader would see particular text due to its placement and visual characteristics, not due to the <u>topics</u> of accompanying text. Nor does Plaintiff cite authority suggesting a reasonable internet reader cannot be considered on inquiry notice because he glossed over a conspicuously displayed sentence (or was somehow distracted from understanding that sentence) simply because that sentence appeared in a paragraph alongside other topics. If anything, the parties' cited cases make clear a reasonable internet user does not "understandably gloss over" information that is conspicuously displayed. (*Id.* at 9); *see Lee v. Ticketmaster LLC*, 817 Fed. App'x. 393, 395 (9th Cir. 2020) ("[Plaintiff] 'cannot avoid the terms of [the] contract on the ground that he … failed to read it before signing,' especially when he 'had a legitimate *opportunity* to review it.'") (italics in original) (quoting *Marin Storage & Trucking, Inc. v. Benco Contracting & Eng'g, Inc.*, 89 Cal. App. 4th 1042, 1049 (2001) and *Mohamed v. Uber Tech., Inc.*, 109 F. Supp. 3d 1185, 1198 (N.D. Cal. June 9, 2015), *rev'd in part on other grounds*, 848 F.3d 1201 (9th Cir. 2016)). Moreover, Plaintiff's argument seems to suggest he should not be bound by a contract because Defendant provided too much detail about the terms by which Plaintiff would be bound. That argument, if adopted here, effectively incentivizes a website operator to not provide more notice to its users in a conspicuous manner and, in any event, Plaintiff cites no authority for it.

Second, the paragraph's length or size do not make the words "Terms of Use" inconspicuous. The paragraph is five sentences; the first two sentences are short and "Terms of Use" appears in the third sentence. (*See* Dkt. No. 22-12 at 2.) Collectively, those sentences span 15 lines, occupying roughly the same amount of space as the four preceding text fields. (*See id.*) So, the paragraph is not particularly long, relative to the size occupied by other webpage elements. To the extent a reasonable internet user would gloss over a paragraph explaining his rights because the first two sentences relate to telemarketing, a proposition for which Plaintiff offers no authority, a reader would still notice "Terms of Use" because "Terms of Use" appears on lines 4 and 5, and

the words are bolded and underlined to draw the reader's attention. (*See id.*)  In other words, "Terms of Use" is not "buried in fine print" at the bottom of the paragraph, nor does the paragraph's length "draw the user's attention away" from the words "Terms of Use." *See Berman*, 30 F.4th at 857.

So, the placement of the "Terms of Use" hyperlink strongly counsels in favor of conspicuous notice.

### b.  Transaction Context

Next, courts consider "the full context of the transaction." *Sellers*, 73 Cal. App. 5th at 497. For example, *Sellers* examined what webpages said "[w]hen a user first accesses the […] website" and whether "the transaction is one in which the typical consumer would […] expect to enter into an ongoing contractual relationship," noting "it is questionable whether a consumer buying a single pair of socks, or signing up for a free trial, would expect to be bound by contractual terms[.]" *Id.* at 476; *see also id.* at 476–78 (holding consumers who paid a "one-time fee of $5" on a website which offered a "trial" to "[t]alk to doctors, lawyers, vets, [and] more in minutes" would not expect an ongoing relationship, analogizing to a California appellate case holding consumers did not expect an ongoing relationship during "the purchase of a single flower arrangement.")  Defendant does not identify other webpages Plaintiff saw, and instead emphasizes the nature of applying to refinance one's mortgage and Plaintiff's subsequent conduct after completing the application. (Dkt. No. 22-1 at 10-11; Dkt. No. 22-11 ¶ 16; Dkt. No. 24 at 8 ("anyone seeking refinancing would understand that such an application requires further interactions[.]"))

Here, the nature of a mortgage refinancing application suggests a reasonable user completing Defendant's application "would expect to be bound by contractual terms" because it entails at least some further interactions in an ongoing relationship. *Sellers*, 73 Cal. App. 5th at 476.  In the application, Plaintiff provided his full legal name and contact information. (Dkt. No. 1 ¶¶ 62, 64; Dkt. No. 22-11 ¶ 15; Dkt. No. 22-12 at 2.)  A reasonable person doing so would expect an ongoing relationship because the point of providing contact information is to be contacted again and get the ball rolling.  Further, Plaintiff was not providing information for the purpose of

14

United States District Court
Northern District of California

buying "a single pair of socks" or a "single flower arrangement," *i.e.*, a "one-time purchase" which takes place "in minutes." *Sellers*, 73 Cal. App. 5th at 496–98. Rather, he was seeking to refinance his mortgage, or at least find refinancing options, which any reasonable person understands entails future communications, if not a long-term endeavor. All of these factors suggest a reasonable user would expect an ongoing relationship, and therefore expect to be bound by contractual terms, at the time they clicked "Confirm & continue" on Defendant's website.

But beyond that one-time click, Defendant has not fleshed out "the full context of the transaction" with respect to what a reasonable user expects after completing Defendant's application. *Id.* at 497. It is Defendant's burden to show assent, and Defendant has not shown, for instance, what its website displays after Plaintiff clicked "Confirm and continue." Relatedly, Plaintiff notes Defendant's website "denotes the *beginning* of an inquiry into potential mortgage refinancing options," not a "long-term relationship." (Dkt. No. 23 at 11) (italics in original). The Court agrees, in part. Plaintiff's argument appears to misunderstand the applicable standard. A user need not anticipate a "long-term relationship" to expect to be bound by contractual terms. (*Id.*) Rather, *Sellers* examined whether a consumer expects a "one-time" purchase or an "ongoing" relationship. *See* 73 Cal. App. 5th at 471–78. Here, a reasonable user would naturally expect an ongoing relationship when they inquire about refinancing their mortgage because mortgage refinancings are not completed "in minutes." *Id.* at 496–98. Plaintiff urges the application is more of an "inquiry" to see one's "available … options." (Dkt. No. 23 at 11, 13.) But his own allegations compel an inference his application is more than a one-time "inquiry," and entails an ongoing process, although the length of that process may vary depending on a user's refinancing options and goals. (*See* Dkt. No. 1 ¶ 27 ("Just tell us about yourself, your home and your finances, and we'll give you *real* interest rates and numbers – not just our best guess. Then, [we] will guide you *through the mortgage process*, from getting approved to closing to managing your payments.") ¶ 52 ("we use the information you gave us […] to provide you with mortgage recommendations and see if we can approve you.") Under Plaintiff's own allegations, he began a "process" by filling out an "application" which Defendant "can approve," and after approval, Defendant can "guide [him] through" subsequent steps in the "process." (*Id.*) The nature of a

15

mortgage refinancing, even just an initial inquiry, entails a much higher likelihood of an ongoing relationship than a one-time flower purchase or a trial for a service provided "in minutes." *Sellers*, 73 Cal. App. 5th at 496–98. Ultimately, even without the "full context of the transaction," here, the transaction context at least slightly favors reasonably conspicuous notice.

\*\*\*

So, Plaintiff assented to the forum selection clause in the Terms of Use. Although the transaction context slightly favors reasonable conspicuous notice, this factor, coupled with the notice's placement and visual characteristics, are sufficient to put Plaintiff on inquiry notice of the Terms of Use. Therefore, by clicking "Confirm & continue," Plaintiff agreed to be bound by the forum selection clause.

**C. California Public Policy Does Not Render the Clause Unenforceable**

A forum selection clause is unenforceable when "enforcement of the clause would contravene a strong public policy of the forum in which the suit is brought." *Argueta v. Banco Mexicano, S.A.*, 87 F.3d 320, 325 (9th Cir. 1996) (cleaned up). Plaintiff incorrectly contends even if he agreed to the forum selection clause, it is unenforceable because it contravenes California's "statutory scheme governing venue in consumer credit transactions–evidencing a strong public policy against enforcement" of the clause. (Dkt. No. 23 at 14-15.) Plaintiff asserts California Code of Civil Procedure Section 395 requires this action be brought where he resides, and he completed the application "while residing in Marin County, California." (*Id.*) Not so.

Section 395 does not render the forum selection clause here unenforceable because it is a venue provision, not a provision regarding "the forum in which the suit is brought." *Argueta*, 87 F.3d at 325. As relevant here, the statute provides

> (b) […] [I]n an action arising from an offer or provision of goods, services, loans or extensions of credit intended primarily for personal, family or household use [...] the superior court in the county where the buyer or lessee in fact signed the contract, where the buyer or lessee resided at the time the contract was entered into, or where the buyer or lessee resides at the commencement of the action **is the proper court for the trial** of the action. […]
>
> (c) Any provision of an obligation described in subdivision (b) waiving that subdivision is void and unenforceable.

16

United States District Court
Northern District of California

Cal. Code Civ. Pro. §§ 395(b)–(c) (emphasis added).  That is a venue selection clause.

Interpreting Section 395(b), one California court of appeal held

> Forum means "[a] court or other judicial body; a place of jurisdiction." Venue is "[t]he county or other territory" in which a case may be heard, i.e., the place from which the jury will be selected. Under state law, therefore, a venue selection clause is purely an intrastate issue involving the selection of a county in which to hold the trial. By contrast, a forum selection clause usually chooses a court from among different states or nations.

*Alexander v. Sup. Ct.*, 114 Cal. App. 4th 723, 727 (2003) (cleaned up) (citing Black's Law Dict. (7th ed. 1999)).  Moreover, "the prohibition upon private selection of intrastate venue rests upon considerations different from those that justify interstate and international forum selection agreements." *Id.* at 731. "The concern with selecting venue is that parties will disrupt the statutory scheme and […] the administration of justice […] to have their cause heard where they believe it will be received most sympathetically. But it is not for the parties to set venue. That is the role of the Legislature." *Id.* at 731.  However, "forum selection agreements 'violate no such carefully conceived statutory patterns.'" *Id.* (quoting *Smith, Valentino & Smith, Inc. v. Sup. Ct.*, 17 Cal. 3d 491, 495 (1976)).  Rather, courts give effect to forum selection clauses due to "commercial considerations" in "national and international commerce," namely to protect the parties' agreed-upon expectations and thereby remove "'uncertainty and possibly great inconvenience.'" *Id.* (quoting *M/S BREMEN v. Zapata Off-Shore Co.*, 407 U.S. 1, 13–14 (1972)); *see also* 114 Cal. App. 4th at 729–30 (noting the California Supreme Court in "*Smith* relied upon *Bremen* in concluding that forum selection clauses were permissible in California").

Here, Section 395(b) does not contemplate whether suits must be entertained in courts "from […] different states or nations" or otherwise specify where a suit must be brought. *Id.*  It instead provides "the proper court for […] trial." Cal. Code Civ. Pro § 395(b).  Therefore, Section 395(b) is plainly a "venue clause" because it addresses "purely an intrastate issue involving the selection of a county in which to hold the trial." *Alexander*, 114 Cal. App. 4th at 727.  Plaintiff does not cite any California caselaw to the contrary.  And because Section 395(b) is a venue clause, as opposed to California's "public policy of the forum in which the suit is brought," it does

not render the forum selection clause here unenforceable. *Argueta*, 87 F.3d 320 at 325; *see also Jefferson v. Lux Grp. Holdings, Ltd.*, 2024 WL 5365063, at *2 (C.D. Cal. Nov. 5, 2024) (enforcing a forum selection clause despite Section 395(c) because under *Alexander*, Section 395 "is a venue provision, not a forum provision, and therefore only voids contractual provisions that override the Legislature's designation of the place for trial, and does not void forum selection provisions.")

To the extent *Abeyta v. DMCG, Inc.*, 2023 WL 2918741 (N.D. Cal. Apr. 12, 2023), holds to the contrary, the Court is not persuaded. In *Abeyta*, "[t]he clause at issue [was] a venue selection clause rather than a forum selection clause." *Id.* at *2 n.2. Accordingly, the court "use[d] both terms" interchangeably, *id.*, even though California case law recognizes the differences between forum clauses and venue clauses. *See Alexander*, 114 Cal. App. 4th at 723, 727, 731–33. *Abeyta* then held "[t]he venue clause contravenes a policy *specifically related to venue* as set forth in Section 395(b)-(c)." 2023 WL 2918741, at *4 (cleaned up) (emphasis added). At one point, *Abeyta* quotes *Alexander*'s sentence "[s]ince the venue statutes themselves declare the public policy of this state with respect to the proper court for an action, agreements fixing venue in some location other than that allowed by statute are a violation of that policy." 2023 WL 2918741, at *4 (quoting 114 Cal. App. 4th at 731). But, read correctly, that sentence does not hold a forum selection clause is unenforceable when it contradicts a statutory venue provision. That sentence summarizes *General Acceptance Corp. v. Robinson*, 207 Cal. 286 (1929), which held a *venue* selection clause is unenforceable when the clause violates California's public policy regarding venue. *See Alexander*, 114 Cal. App. 4th at 730; *see also id.* at 727–29 (describing *General Acceptance*'s holding). Immediately after that sentence, *Alexander* explains how a subsequent decision interpreting a forum selection clause, *Smith*, limited *General Acceptance*'s reasoning to venue selection clauses: "[a]s *Smith* succinctly noted, forum selection agreements 'violate no such carefully conceived statutory patterns.'" *Id.* at 731 (quoting 17 Cal. 3d at 495); *see also* 114 Cal. App. 4th at 728–29, 731 ("*Smith* also limited *General Acceptance* as follows: 'While [*General Acceptance*] is factually distinguishable and, accordingly, may be said to rest upon policy considerations not involved in the present action, nevertheless to the extent that the rationale of *General Acceptance* is inconsistent with our opinion, we decline to follow it.'") So, to

18

the extent *Abeyta* interprets California case law as holding a forum selection clause is unenforceable when the clause violates a statutory venue provision, *Abeyta* is unpersuasive.

Accordingly, Plaintiff has not shown the forum selection clause is unenforceable.

### D. The Section 1404(a) Public-Interest Factors Do Not Overwhelmingly Disfavor Transfer

Because Plaintiff agreed to a forum selection clause, it is given "controlling weight in all but the most exceptional cases" and the Court disregards Plaintiff's choice of forum and only considers public-interest factors. *Atl. Marine Const.*, 571 U.S. at 63–64 (cleaned up). "As the party acting in violation of the forum-selection clause, [Plaintiff] must bear the burden of showing that public-interest factors overwhelmingly disfavor a transfer." *Id.* at 67. Public-interest factors "include 'the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; [and] the interest in having the trial of a diversity case in a forum that is at home with the law.'" *Id.* at 62 n.6 (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 n.6 (1981)). Courts also consider which forum state "is most familiar with the governing law[.]" *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498–99 (9th Cir. 2000).

Plaintiff has not carried his burden of showing these factors "overwhelmingly disfavor a transfer." *Atl. Marine Const.*, 571 U.S. at 67. The parties' cited statistics suggest the Northern District of California and the Eastern District of Michigan have comparable "administrative difficulties flowing from court congestion." *Id.* at 62 n.6 (cleaned up); (*see* Dkt. No. 22-1 at 23 (noting the two districts have a roughly 3-month difference in "time from filing to trial for civil cases"); Dkt. No. 23 at 22 (noting a 0.7-month difference in "time from filing to disposition")).) Additionally, both forum states have an interest in adjudicating the controversy; Plaintiff is a California resident suing under California law and Defendant is a Michigan company. Plaintiff emphasizes California has an interest in adjudicating California-law privacy claims and this District has expertise in evaluating claims involving privacy and technology. Maybe, but those interests do not "overwhelmingly disfavor" transfer because even assuming the Terms' choice-of-law provision does not apply, a federal court sitting in diversity jurisdiction, not a California state court, will be applying California law regardless of whether the case gets transferred. *Atl. Marine*

19

*Const.*, 571 U.S. at 67.

Given Plaintiff has not demonstrated the public-interest factors overwhelmingly disfavor a transfer, the parties' forum selection clause is given "controlling weight" and transfer to the Eastern District of Michigan is appropriate. *Id.* at 63 (cleaned up).

**CONCLUSION**

For the reasons set forth above, the Court grants Defendant's motion and transfers this case to the Eastern District of Michigan. Plaintiff assented to a valid, enforceable forum selection clause and has not shown the public-interest factors overwhelmingly disfavor transfer.

This Order disposes of Docket No. 22.

**IT IS SO ORDERED.**

Dated: June 12, 2026

JACQUELINE SCOTT CORLEY
United States District Judge